Again, thank you, Your Honor. David Salmons on behalf of the Imperial County Air Pollution Control District. Ms. Peterson from the Parks Department will take three minutes of our time to address issues related to the Parks Department, and I will attempt to reserve three minutes for rebuttal. The Exceptional Events Rule is a critical feature of the Clean Air Act. It is designed to exclude data showing exceedances of air quality standards from EPA's determinations under the act, where exceptional events, uncontrollable events, such as unusually high winds, cause those exceedances. In that way, the rule protects areas like Imperial County from having to impose costly controls on human sources of dust that have little ability to actually affect the exceedances at issue. This case demonstrates precisely why this rule is important. The only exceedances of the dust standard that could justify treating windblown dust as a significant category of pollutants, and therefore subject windblown dust categories to the demanding best available control measure standard, were three days over a three-year period that is undisputed or accompanied with significant high winds that were unusual for the area. If one excludes those three days, was the county under the bare limit? Absolutely, and there is no dispute about this, Your Honor. The government itself concedes in the final rule that... What they say, as I understand it, is it's not enough to identify a day and say, on that day, for example, there were 90-mile-an-hour winds. You have to show not only the event but the causation. Well, you know, actually, I think, Your Honor, that's not the fundamental position that they take. I mean, that's certainly a requirement of the act, and that's our argument, that that's what's required. I think this part's undisputed, that there's really two steps to the exceptional event analysis. The first is identifying whether you had something that qualifies as an exceptional event, and in this context, that means a natural event that affects air quality and that is not reasonably controllable or preventable. The second step of the analysis is whether that event was a clear cause of the exceedance, which the final rule makes absolutely clear is defined to mean but for cause, that but for the natural event, there would not have been an exceedance. Now, what this case is about... And your client believes that you can meet both standards to the identified events. Without a doubt, and we don't even think it's a close case. But what happened in this case, Your Honor... And you presented that argument, evidence, whatever, to the agency, and they said that's not enough. Well, what they said specifically, and this gets to the legal error that I'd like to focus the court on, what they said is, even though there's no mention of it in the final rule or in any prior history of its application that we're aware of, what they said is that the reference in the definition to a not reasonably controllable event means that if there's any potential that anthropogenic sources of dust were involved... Human. You have to first show the agency that you have strict controls, in this case, best available control measures on all of the human sources of dust as a precondition for them even doing the kind of causation analysis that you're talking about. What they say is that... And let me just make clear just how, from a district standpoint, really crazy this is for us. Because what they say is in order to determine whether you have a significant source to which you have to apply best available control methods, you have to first show us you're complying with best available control measures. There's a sort of heads-I-win, tells-you-lose aspect of this, and they make it very clear in their final rule. Even if, they say, you have a natural event that would have caused an exceedance, and there's no way you could have stopped that exceedance. To give an example, let's say a tornado came through the county, and it's undisputed that that tornado all on its own would have picked up enough non-human dust from the desert. Have you checked out that tornado hypothetical with the Chamber of Commerce? I have not with the Chamber of Commerce, Your Honor. But I do think this is EPA's position from its final rule in this case, is that even if it's clear that that tornado, without regard to any human sources, would have picked up enough dust from the desert to cause an exceedance, as long as there's any human source of dust that EPA believes should have been more aggressively regulated. In their view, that's not an uncontrollable event. Pardon me for re-plowing old ground, but if the agency is wrong about exceptional events, the county's in attainment, correct? Correct. And let me be clear that it's undisputed that but for these three days, in fact, I'll show you, just to make clear, Your Honor, from the final rule where they say exactly that, if you'll give me just a moment. They say in response to comments from us that their reading would mean that even if you couldn't have The agency said that best available control measures are required here and that. Mr. Sam, I don't read the government's position that way. You're saying that the government's position is you have best available control methods have to be shown as to all human. And I disagree with the use of anthropogenic as I looked it up. And it doesn't have to do with human made. It means a study of human existence. But we leave that to the bureaucrats. Let's talk about the government's position. They're saying that you didn't provide sufficient data regarding man made dust from off highway vehicles and agricultural tillage sources. They're not saying that you have that. Imperial County has to have DMC best available measures. They're saying you didn't provide enough data that the dust came not from man made sources. They say multiple things. But the first thing they say and the thing that we believe drives the whole analysis, Your Honor, is that we were required to apply backup or best available control measures as a precondition to showing that you had an uncontrollable event. And what they say, and this is where I found. I know. But aren't you saying as long as you tell us how much man made dust is coming from off highway vehicles and from agricultural tillage, then we can determine whether the particular account which exceeds the measures of allowable is made up of man made dust or of desert dust blown from weather. But you haven't done the first thing, which is to gauge the amount of man made dust. Now, you might well say they don't tell us what to do. And that's a good point. They don't tell us how many things we have to control. And that's a good point. But their overall argument is they haven't done enough. You haven't, they say something else, you haven't resolved or you haven't characterized, as other bureaucratic words. You haven't shown proof of where the dust is coming from. They do fault aspects of our showing. There's no doubt about that. My point, however, is that they are applying an incorrect legal standard that requires as part of our showing a demonstration that we're applying best available control measures. So you're saying they're not only saying that permeates every aspect of it, including the place where they say what you're on. So what you're saying is they're not saying we have to have dust measuring stations alone, but we have to have not only dust measuring stations, but best available modifications, whatever it's called, BMC and dust measuring stations. There's no doubt about this, Your Honor. If you look at excerpt from page 64 where they deny the exceptional event, they say that because implementation of BACM is required in serious PM10 non-attainment areas, such as Imperial County, it is appropriate to consider the level of control, that level of control, excuse me, in evaluating whether reasonable controls are in place for purposes of the exceptional event rule. So they're saying that you cannot have an uncontrollable event unless you can first show that you have all human sources that are being regulated to the extent of best available control methods. The reason that is so backwards. What's wrong with that? The reason, Your Honor, is this. They're saying you can't just go ahead and blame it on Mother Nature until you can first show us that where dust and whatever toxic material is in the farms or in the roads that are being dealt with through human efforts, that you've subjected them to the best available means of tamping down the dust. What's wrong with that, Your Honor? And so once you show us what you've been doing in these areas that you have control over, then as far as the dust that's created by tornadoes, hurricanes, heavy blowing winds, unless you take care of the part that you can't take care of, then we're not going to accept your data on the rest of it. What's wrong with that, Your Honor, is three things. First, the underlying issue is whether or not windblown dust sources are a significant source of the pollutant in the county. If the answer to that question is no, then there's no dispute that best available control methods do not apply to windblown categories of dust. I've driven through there now. I haven't been there for a while. But I think 30, 40 years ago, you go through there, the winds are blowing so strong that you can't take the paint off your car. There's no doubt that this is a desert that sometimes has winds. But I would just point out that the winds that are at issue in this case are exceptional. There's no dispute about that. They were well above the baseline norms. EPA itself characterizes them as outliers. And the PM10 measurements that occurred on these only three days over three years were extreme. They were in the 98th and 99th percentiles compared to historical. And they coincide perfectly with the times. On the September 6th event, you had readings in August before September 6th as to the actual wind velocity at several points. But on September 6th, you didn't have wind velocity readings. Isn't what the EPA is saying is you can't justify the September 6th as an exceptional event because you haven't showed us the wind velocity readings. And you can show us wind velocity readings because you had them back in August. Well, what happened on September 2nd, and I don't want to spend. If I can answer this factual question to get back to what I think is the legal error. What happened on September 2nd was known as a Class III wind event, which is that you have very high winds in the upper atmosphere because of heavy thunderstorm activity that creates an updraft that takes dust from one area of the desert, transports it through those high winds, and then deposits it in another area of the desert precisely where there is lower winds. And so the fact that there were not high wind readings right at that monitor is perfectly consistent with the high wind event that we claim. And that's why it's true that EPA tries to poke holes in our showing. What fundamentally drives their analysis throughout it is that we are not controlling the human related sources of dust. Let me ask you another question. Has the EPA ever told you that certain station monitorings would be sufficient if you were to install them? I don't think there's any issue in this case about where our monitors are or what they're reading. In other words, the effectiveness of them. I think everyone takes the data as a given. But they keep saying the data is not enough. It's not sufficient. What do they mean by that? Have they ever told you why it's not sufficient? I think there's a lot. No, I think not clearly. But then the question is, suppose you were to sit down in a room and say, now what would you want us to do and put it in writing and then we'll consider whether we want to do it or go back to court. Has that ever happened? We have. We have been through a very long process where we tried to get putting aside. Have you ever mediated? Our rules approved as backup. We had EPA. Have you ever mediated these particular? Pulled the rug out at the last minute and changed their mind. Have you ever mediated this particular issue to say, what do you want us to do? Here's a map. You tell us where you want our stations to be. You tell us what reports you want from us. I don't know whether we specifically had deviation. I don't think we have. But I can tell you that we have endeavored many, many times to resolve this. But I do think that what is fundamentally important for purposes of this case is that they applied the wrong legal standard because they adopted a rigid precondition as to what constitutes an uncontrollable event. And they said that as long as you could affect the human sources of dust, it is not an uncontrollable event. And that would mean that if you had a tornado that cut across two counties, one of whom has human sources regulated the way EPA approves, and the other they're quibbling with their human source regulation, and it's undisputed that that tornado all by itself would have picked up enough dust, not human-related dust, just dust out in the desert, to cause an exceedance, that one county they would treat that as an uncontrollable weather event, and in the other county they would not. And I think if you ask them that question today, they will give you that answer. That's exactly what their final rule says. Their final rule says that controllable means that you can have any impact on the actual reading at the monitor. If you could have potentially lowered the reading at the monitor, and it's far from clear that any of the things they're talking about here would have had any practical effect at all, but they say they equate the event with the high reading at the monitor, and they say as long as you could have controlled that in any way by reducing human sources, it does not matter that the natural event would have caused an exceedance all by itself. Now, one, that puts the cart before the horse and gets into circularity. You have to apply BACM to decide whether BACM applies at all. But more fundamentally, there is an express causation rule in the rule itself, and the causation requirement is but-for causation. And you cannot bring into consistency this precondition to aggressively regulate all human sources first with a but-for requirement, because when you have a type of weather event we're talking about, and we think this clearly would satisfy if they were applying the standards with the proper legal standard. Mr. Sammons, you said you were going to reserve some time. Yes, and I should sit down. Thank you, Your Honor. Are you reserving this time for your associate or for rebuttal? Your Honor, I'm here on behalf of the Department of Public Parks and Recreation. They were a co-petitioner. The two petitions were consolidated, and I will try to keep my comments to very brief and provide the perspective of parks to allow some rebuttal by the co-petitioners. What additional position would you take that Mr. Sammons did not? I agree with the arguments regarding the exceptional events, and I will avoid going over them. We want you to, you know, this is an important case. Yes. We want to hear what you have to say. And I appreciate that, and I will attempt to limit my arguments and be very brief. And we don't want to make you nervous either. I appreciate that too. Here, as has been discussed, EPA abused its discretion in interpreting the exceptional events rule. It departed from the rule's plain language and essentially wrote it out of existence. And Congress adopted the rule to provide a mechanism for states to exclude exceedances that are directly caused by exceptional events. And I want to point out why that's important. And the reason it's important is that a source, such as windblown dust, is deemed significant and therefore subject to best available control measures based on whether it contributes more than the threshold amount, which has been designated by EPA, to an exceedance. So if these exceptional events were excluded, windblown dust would not be a significant source and would not otherwise be subject to best available control measures. And again, where they've departed from the plain language is the rule defines an exceptional event in part as one that is, quote, not reasonably controllable or preventable. Instead of analyzing whether the event was reasonably controllable or preventable, EPA interpreted this element to impose the reasonable controls or best available control measures on all human sources of dust. And that's what then extended to parks and off-highway vehicle usage. And it's this faulty interpretation of the rule which is leading to more stringent demands up to and including an outright ban on off-highway vehicles in Imperial County. EPA further erred in their analysis by refusing- Off-highway vehicles? What are you talking about? Those dune buggies? Dune buggies. There are also streets- Why didn't you say dune buggies? It's a bit broader, but dune buggies is a subpart of off-highway vehicles. Some of them are street-legal vehicles that are being used for off-road. So I'll go with buggies this afternoon or morning. But again, off-highway vehicles is a huge use in Imperial County. There are 750,000 to a million visitors to state lands. That's separate and apart from those visiting Bureau of Land Management. And there's a huge economic boon to Imperial County from those people visiting. The people that drive their vehicles down there with the trailers in the back, those dune buggies, they bring a lot of business down there. Correct. So you're talking about money now. Exactly. And EPA determined that those, that impact of prohibiting, completely banning OHV is irrelevant. But their own guidance requires it to determine economic costs and other costs in determining best available control measures. And the bottom line is even if there were a complete ban on dune buggies, Imperial County is a desert and there would be exceedances on those days with exceptional events. And therefore, we request that this decision be overturned. May it please the Court. My name is Christina Richmond. I represent the United States Environmental Protection Agency. And with me at counsel table today is Kara Christensen with EPA Region 9's Office of Regional Counsel. This case is about what the Imperial County Air Pollution Control District should do and can do to regulate fugitive dust or PM10. Let's assume that the panel concludes that EPA was not arbitrary and capricious, et cetera, with respect to the challenged action. What is it you want Imperial County to do? What is it that EPA wants the county to do? EPA wants Imperial County to implement best available control measures through Regulation 8. And the EPA found that most of Regulation 8 did comply with best available control measures standards. And there's just a few specific deficiencies that the agency outlined in the final rule. And what are those? They are they depend on the different types of sources being regulated. But, for example, for Off-highway vehicle activity is one, right? That is a source that is coming from open areas. And the agency found What does the agency want the county to do with respect to off-highway vehicle activity? There are a few things. There's a definitional problem in the regulation right now. Disturbed surface area is not defined. Why don't you go speak a little slower, would you please? Defining disturbed surface area. That's the trouble with the younger generation. They're used to twittering and this and that. No, it's, you know, make every word count. So what is it that the agency wants Imperial County to do with respect to off-highway vehicle activity, specifically? The biggest thing is that the way the regulation and all the rules fit together now, most of the off-highway vehicle emissions are coming from Bureau of Land Management areas. And those are only regulated by the requirement to have a dust control plan. And EPA described in the final rule why that requirement in Regulation 8 was not sufficiently enforceable. You want the district to control the BLM? That's true. I thought they were on your side of the house. Under the Clean Air Act, all federal entities are supposed to comply with the Are you suing the BLM? No. You want the county to tell BLM what should be done with respect to off-vehicle activity? Your Honor, that's correct. Under the Clean Air Act, the states have the primary responsibility for enforcing and developing these rules. And EPA's role is to evaluate those rules and determine if they're sufficiently enforceable and if they satisfy the standards for best available control measures. So what do you want Imperial County to tell Bureau of Land Management as to what they should do with off-highway vehicles? Ban them? No. We have not said banning off-highway vehicles. What has to happen under these state implementation plans, the state submits the rules themselves that describe what the restrictions are or aren't, and then along with that, they submit an analysis that they perform, called a back-up analysis that looks at what types of control measures are available here, what have been done in other counties, and then compare them based on any differences and taking into account economic feasibility. That analysis did not happen at all in this case, and that is part of the deficiency with these rules. And that is why if the agency, if Imperial County and the state performed that type of analysis, they could go through a very comprehensive determination of what would make sense. Would restricting off-highway vehicles on certain days make sense? Would restricting it seasonally or fees? But what we had, what the agency had to act on, had no analysis about whether fees or any existing restrictions were designed for or effective at regulating PM10. So you've told the district that the rule is deficient in these respects. Exactly. The proposal document and the technical support document accompanying the proposal and the final rule itself all describe in great detail what exactly EPA is looking for and what they want to see in the analysis and in the revised rules themselves. If the panel were to conclude that the district and its affiliated entities, the petitioners in this case, are correct about the three, I think it is, exceptional events, what impact does that have on off-road vehicle activity, unpaved farm roads, et cetera, the other deficiencies that you've noticed? The exceptional events, deciding on the exceptional events does not affect, that affects whether windblown dust sources are considered a regulated, a significant source that needs to be regulated. Would you kindly start all over again and more slowly and in fewer bureaucratese terms. What would be the effect if the petitioner wins? Sorry, can you repeat the question? Yes. If the petitioner is correct about these three events being exceptional events, what effect would that have on your proposed final rule? All right. If they are correct and there are no exceptional events that are excluded, there are still two categories of dust sources that would need to be regulated, unpaved roads and tilling dust. The Regulation 8 still has deficiencies for those source categories. Unpaved roads, and what's the other one? Tilling dust, so associated with agriculture activities. And so EPA described in the final rule what those deficiencies are that are associated with those source categories, which is completely separate from anything to do with exceptional events. There are things like. So if I understand you correctly, if the petitioner is right, you will still tell them that they have to regulate man-made dust from unpaved roads and man-made dust from tilling activities. They need to regulate those categories. So aren't they willing to do that now? They disagree with our understanding. When EPA reviewed those regulations, it pointed out deficiencies that it found in how those regulations. For example, if we're only talking about tilling dust and unpaved roads, EPA described what the specific deficiencies were in the rules related to those categories. So the Air District would still need to correct those deficiencies. Give us some poor examples. So, for example, under Rule 806, that regulates conservation management practices, and it sets forth menus that farmers or people are supposed to pick, and then they can implement those. And EPA found that that menu process did not satisfy the standard for best available control measures and was not enforceable under the Clean Air Act. So give us an example. You've got a farmer at Imperial Valley, and it's a big agricultural area in this country, right? And so just one example. What is the county doing, and why is that insufficient? I'll stay with the example of Rule No. 806, which is about agricultural conservation management practices. There is a rule. What do you want the county to tell a cotton farmer in the Imperial Valley to do with respect to tilling the soil? I don't have an example specifically about tilling. Are there cotton farmers in the Imperial Valley? I'm not sure if there's cotton farmers. Does anybody know? Are there cotton farmers? Huh? They grow cotton here? I don't think so. Lettuce. Okay, if there is some kind of – I'm sorry, I don't have an example like that. But there's basically – there's some flexibility. These menus provide different things that people can choose, and it could be something like speed limits or equipment modifications. And EPA found that those descriptions were too vague, and that if a farmer picked one of those items from a menu, then there's no way for EPA or anybody else to know that they're using that process and what it actually means. Like, I don't know what it would mean to have a speed limit because there's no numerical speed limit. Are speed limits on tillage? That's not on the tilling. That would be on a road. Okay. Or on a dune buggy. Well, that would be a possibility for an off-highway vehicle, a limitation that would be considered. But part of the problem here is that there were these menus where people could pick which conservation management practice they want to implement, and there's other – other air districts have menus as well, but they have an application and an approval process that the air district would go through and refine what exactly that means. I was asked the same question or follow-up on Jet Bae's question. Has there been any attempt to mediate this dispute? I think that the mediation was a possibility, or it was brought up as a possibility when the case was first filed and that both parties agreed to not pursue mediation. And from your point of view, why? From the agency's point of view. I think that the agency has clearly explained to Imperial County exactly what it's looking for, and it has set that out in the proposal documents and in the final rule and needs the rules to be modified. So I don't know what – I wasn't involved when the mediation possibility was being discussed. To speak very broadly, it seems to me there are about two or three options here. One is for us to decide this, us being these three judges who are – my colleagues are wonderful people and educated and articulate, but we don't know from Adam about BACM, Best Available Control Methods. Or you folks can sit down together with this thing sort of overhanging, the litigation overhanging, and attempt to resolve the matter, both sides being reasonable, and come to a conclusion and protect the environment and let Imperial County do what it's – and the state to do what it's supposed to do. But I just don't understand why you – both sides, I'm not criticizing any one side – are not willing to sit down and try to mediate this dispute and have them say, you want us to do X, that's physically, economically, whatever, impossible, but we can do Y, and come to a conclusion. Respectfully, Your Honor, the way that this state implementation process works is supposed to be – they devise the rules and the analysis supporting the rules. And you get to say, that's not enough. Yes. And they're saying, court, tell them that that's too much. I don't know what other – the agency has already explained what it means. Well, suppose this panel concludes that you're wrong about some things. For example, about causation, or for example, about whether something was an exceptional event or not, or whether the agency is being arbitrary and capricious about dust that results from the Border Patrol driving down along the border where Imperial County meets – what is that, Baja Norte del – Baja Sur del Norte, Baja del Norte, whether they're – whether they have any control over that. I'm sorry, what are – did you repeat your question? Suppose we conclude that the agency has, in some respects, made determinations that are either arbitrary or capricious or not consistent with the Clean Air Act. Then you're back to deciding what they – what you can have – ask them to do with respect to a rule or not, correct? If – yes. Let me ask you a question, Ms. Richmond. How do you meet Mr. Salmon's point that, based on excerpts of Record 64, that the EPA is requiring as a precondition to determining whether there is an exceptional event, that best available methods of control are shown to exist as to all what you call anthropogenic, which I call man-made sources of dust? Is he right? No, we disagree that that is a precondition, that when EPA applies the exceptional events rule, it utilizes a weight of evidence approach. So it looks at all these different things and weighs them together. And in it, looking at this Imperial County, where best available control measures have been – it's a serious non-attainment area and it's needed best available control measures, and the agency concluded that it was reasonable to expect that they would be controlling the human sources to that degree, in this situation. We have three events, April, June, and September, right? There are ten exceedances. Ten exceedances on three days. Yes. Yes. Exceedances, that's another new term, are three days. If we determine that the EPA has been insufficiently precise in saying what proof the Imperial County people have failed to come up with, which would satisfy you as to whether they were exceptional events or not, they may well win. And I think what Judge Hawkins was mentioning, and I mentioned earlier, was wouldn't it be better to sit down with a mediator, which we have in this court, and determine what specific measuring devices or specific further data is needed and can be provided, and then start all over again? Well, I would have to consult. I don't know what the agency's position is. You don't have authority for that from the EPA. I mean, now how many enforcement people does the EPA have for Imperial County? I don't know how they organize themselves. People work on a lot of different projects. I mean, from the EPA, you know. What's the… The reason I ask that question is I've had a number of big EPA cases, and I have found in one instance involving a water treatment plant that throughout the southern part of the state, for all the EPA, for all the projects that EPA was watching, and projects that were being built pursuant to court orders, that there was one for the whole state, southern part of the state, one. So is that what your problem is down in Imperial County, that you don't have enough inspectors because of budget constraints, and that using these events that come up, where you have these high winds and a lot of dust flying through the air and through the sky, that somehow those events, which these exceedances occur, in the mind of the EPA, that there's an assumption or presumption that since there were these exceedances, the control over areas that humans create to loosen the soil and the dust, that the county and the state are not performing their duties? No, I don't think there's a presumption. I think that the conclusions in this case were based on the facts submitted to EPA, where the state and the district said that, for example, for the 2007 events, 75% of those sources were natural and 25% were human, and that supposedly where the event happened and where the monitors were, there are activities. How do they figure that out? I think that they're basing it on monthly or annual emissions information that they have about the general spread of where the sources are. But the problem was that it wasn't specific enough. I mean, it's an assumption based on the data that they have available, but even with that data available, there were unexplained circumstances, like with human activity happening in areas near the monitors that had not been explained, and that was part of what was the problem. Okay, and now the EPA doesn't always get along with the BLM, is that right? I don't know that I have a general... BLM has other environmental agencies. Fish and wildlife are logging up in the northwest part of the country. The problem here, in this case, regarding BLM... Again, the BIA is a big employer in a lot of counties, and so they get a lot of pressures from Congress. You know, like, you're ruining my district. We have all these dune buggies coming in here, and it's a good source of income. These are complicated issues. I agree. These are complicated issues. A lot of conflicting interests are involved. That is... I know you're trying. That is true, and overall, the agency exercises its judgment, its technical expertise when it's acting on these types of factual scenarios with the exceptional events documentation. These are for public health standards, and Congress directed EPA, first and foremost, to be protecting public health when it acts on these exceptional events. In agriculture, they use some materials that are considered toxic. That's why you want to dampen down, make sure the soil is less likely to create particles that can harm the environment. Yeah. In this case, we're just concerned with the coarse particulate matter, or PM10, which does arise from agriculture, as you were suggesting. I see that I am out of time, so I'll just conclude by just summing up that EPA is not asking the county to control the wind or spray down the desert. It's just asking them to control what they can control and to demonstrate that to EPA, and we respectfully request that the petitions be denied. Your Honor, if I may, I'll try to be brief in rebuttal. If I can start with a statement that my friend from the EPA just made, that they were not applying a precondition based on compliance with best available control methods. I just think that is a fundamental change from what they did in the final rule. It's clearly not correct. If you look at excerpt of records on page 8, there's a fact of the excerpt. Mr. Baker? Yes, this is the excerpt of records, page 8. This is from the 75 Federal Register 39372. And in response to the district's comment that this precondition they're reading in, and I would just point this out. What my friend said is that they're applying a weight of the evidence to the causation analysis. And remember I said that there are two steps. First you have to identify an uncontrollable event, an exceptional event, and then you have to ask was it a but-for cause of the exceedance. What specific language on ERA do you want us to look at? If you start at the bottom of the middle column, they're talking about the requirement of reasonable control over sources as part of the definition of whether you have an event at all. This is before you get to the weight of evidence and the causation analysis. And they're opposing a condition on what the meaning of an uncontrollable event is that doesn't exist in the rule. Does the language start with, therefore, to meet the not reasonably controllable language? Correct. Therefore, to meet the not reasonably controllable or preventable criterion, states must demonstrate that reasonable controls, which, as I indicated, they have defined to mean best available in this context because we're in serious nonattainment for other sources. Regardless of whether, et cetera. That's the language you want us to look at? Yes. So they say states must demonstrate that reasonable controls, which they interpret here to mean back them, were implemented to regulate or reduce emissions regardless of whether the controls would have prevented the exceedance. So even if you have a natural event that all on its own would have caused an exceedance, they say so long as you could have controlled human sources more, it is not an uncontrollable event for purposes of this rule. You don't even get to the causation standard yet under that reading. And that precondition that they're applying is fundamentally inconsistent with the but-for test. It's much closer to a sole cause or some other type of causation standard because clearly you can have a storm, as we have here, that, as she indicated, we do have, by the way, lots of monitoring, lots of data, very scientific modeling that we provided to track the various sources to the best we possibly could. It's not like particles of dust carry identification cards. You can tell where they came from. We did the very best we could, and it was clear from that modeling that the vast majority of the dust we're talking about in these states, in excess of 75 percent of that dust came from areas of the desert on which there's no off-road vehicles, dune buggies and the like. It just came because the high wind lifted dust up off the desert. And you were able to identify the source of that dust, and you gave that information to EPA. We provided it to EPA, and EPA got to know based on this precondition and then wrote a final rule that justified it with everything they could. And that's why we say if you'll reverse, because they applied the wrong legal standard, this hard and fast precondition, we think we can get to yes with them. We tried very hard to get to yes. We had years of negotiation and hearings, and we got to the point where EPA, with our back-up rules, told our board that we had made it and that they were going to approve it. And then, you know, things changed, I guess, and the main EPA changed their mind. What year was that? This was 2005? 2005. And they changed their mind, and they said basically give us more, with a lot of lack of specificity I think was demonstrated today. And most of the things that they point to is saying that it's inadequate or very minor parts of our rules that are expressly the same as were approved for other districts in their back-up rules. And so this is where we feel like we've got to know because they applied the wrong legal standard, and if there was a way for the court to reverse that legal standard and just rebound, we think we can get to yes. We're trying very hard to get to yes. We've had very stringent controls in place across the board for all of these things, including things that we think are not serious sources, significant sources of damage. What about the other 25 percent? Well, there's – inevitably, Your Honor, when you have a major wind event in the desert, some of the dust comes from human-related activities. You know, dust gets – you get caught entrained in the air. But you would not have had to see this but for the natural component. And of that 25 percent, how much of that contains material that is endangered? What we're talking about here, Your Honor, is simply dust. We're talking about particulate matter that's 10 micrograms per cubic meter. I don't want to get technical, but you're talking about dust. But I would say this. The human – this is very important, I think, Your Honor, your question raises, which is there's no dispute about this. The human activities we're talking about take place all year long. They take place all year long. All year long. And for every – virtually every other day of this three-year period, not only were we below the dust standard, we were far below. I mean, you know, 75 percent of the time, we were more than two-thirds below the standard. And 90 percent of the time, we were more than a third below it. So we weren't even close to it. And there's no dispute that there's no other explanation available for these three spikes that occurred in connection with high-wind events. This is a district that is trying very hard to regulate their dust and to get it under control. They have done a remarkable job, with the exception of these high-wind events that occur beyond anybody's control. I didn't catch up as fast as Judge Hawkins did. I'm looking at ER-8, which you cited me to. Where do you want me to start reading? Where do the italicized responses? This whole – I would say if you wanted to read the whole thing on your own time, I would start with, you know, paragraph number two on that page, which gives our comments and then their response. But the key part of it – We've got these tabs here. Now, what tab are you looking at? Right here. Under number one. Events not reasonably controllable is preventable. Correct. Or preventable. Correct. And EE stands for who? Exceptional event. Oh, that's April, June, and September events? Correct. Okay. Exceptional event number one is the April event. Number two is the June event. And number three is the September event. Correct. Okay. April. And so what they say – you know, what I just read was because of their definition of the phrase reasonable control in – and, again, this is not the balancing. This is not the causation analysis. This is not the weight of the evidence. This is just deciding whether you had an event that was beyond your control. And they say you don't have an event unless you have BAMC on all human sources. That's exactly what they say in this case. And you're saying that's not the question of but for an exceptional event? When the underlying dispute is about whether windblown sources are significant and, therefore, subject to BACM, it's irrational. You can't say that you have to comply with BACM in order for us to determine whether it applies. I've got you. And that's the fundamental legal error we say occurred here, just preconditioned. It's not in the rules. It's inconsistent with the causation standard. It's inconsistent with another part of this rule. Now, one more question. If you're right and they're using the wrong legal standard, where do we look to see if that legal standard results in the rule they've adopted? I mean, they may have a wrong – If they applied the correct standard, would they come out the same way? No, no, no. Where do we look to see that they applied the incorrect standard? We know that they might have cited the incorrect standard. Did they apply it? Where do we look to see that? I think this page in the ER is exactly that. This is where they say that even if you have controls in place, but as long as we don't think they're BACM, as long as we don't think they're – We're not going to consider your exceptional event evidence. Correct. And even if you have – basically, the bottom line is this. If you are not controlling a single human source the way they would like, it is impossible to have an uncontrollable event. And I'm not going to look at this.   I'm going to look at this and see what you think. So I would say that the agency is looking at the standard in terms of the severity of the weather event. Got you. In regards to how severe the weather event is. Okay. Thank you. Thank you both for a very illuminating argument. Do you have a response to this? It's not a precondition. I think I addressed that earlier. It is something that the agency is looking at as it's evaluating all of the different criteria. Say that again in English. We're talking about the phrase not reasonably controllable or preventable. Yes. That's the spin that the interpretation EPA has applied to that phrase in this case has been looking at controls on human sources and reasonable controls on human sources, which is what the exceptional events rule is supposed to do. EPA is supposed to. So you agree with Mr. Sammons? No, we do not agree. Sorry. Try again. Okay. When there are these high wind events that are dust and wind, when they're looking at the dust part of it, the part of the dust that's contributed to by human sources, EPA has to look at whether that is controllable or preventable in order to fit into that part of the case. No. If there's so much uncontrollable dust that that by itself would cause an exceedance, you don't have to look at the controllable sources at all. That's exactly what the agency is doing as it's evaluating the amount of dust that is being looked at. The burden of proof is on them to prove an exceptional event. If they prove there was such high wind that if there's a scale of 10, all 10 would have been satisfied by the high winds. You don't have to look to see whether they have controllable dune buggies and agricultural tillage. They've won. Respectfully, they have not demonstrated that. There were serious problems with the causation parts of the exceptional event. That's another argument. That's another argument. That's part of what is... And so as to the causation part, you're saying they haven't provided enough data. And I'm saying, what data did you demand from them to present that they did not present? Or did you just say, well, that's not enough? EPA looks at that criterion. We're just not reasonably controllable or preventable. It looks at that on a fact-specific basis. And in this case, we're talking about winds that were in the 20-mile-an-hour range where there were significant contributions from human activities. EPA weighed all of those together and found that the event was reasonably controllable or preventable. But you said to them that you have not presented sufficient data, correct? Yes. What data did you tell them they needed to present to make it sufficient? The data they needed to present would have been... No, no, not would have been. What did you say in black and white to them would be sufficient to fulfill your requirements? More monitoring stations? More wind measuring per mile per hour? What data did you say to them, bring us this and it will be sufficient? EPA looks at documentation on whatever... Some events require more documentation than others. Like if there was a tornado, I don't know that there would be a lot of documentation required. These were closer calls. So are you telling me that you didn't tell them in black and white what more they should present to you? We told them that what they gave to us... Was not sufficient. All they said was that BACM is in place because of Regulation 8 and that agricultural sources were controlled because of some following field program where it's in the record that there are more acres outside of that program than there are in that program. So all we have is a statement from them that they are applying best available control measures through regulation that EPA found did not satisfy best available control measures and a statement that agriculture is being controlled by a following fields program that is not addressing all of these acres. So did you tell them we need a following fields program which addresses acres which you did not cover, which are these acres, these acres and these acres? We did tell them that we wanted an explanation of why they thought that this program was good enough. Did you give them a detailed list of facts which you needed in writing and is that part of our record? What the record has is... Can you answer that yes or no? No, because they did not provide anything to the agency. So we can't tell them what they needed to have submitted because they had just conclusory statements. Because of what? Their justification for the controls that they applied to human sources were conclusory statements that were not supported by the record. And so EPA said that's not good enough and to answer Judge Bea's question, that's the extent of the detail that EPA provided to them about why it wasn't good enough. Thanks. Thank you. You said that with 20 mile an hour winds, you measured the materials that were coming from the agricultural areas and the test there showed that there were no exceedances that would be dangerous to the environment or the human beings. That's correct. The agency is very protective of the public health. This is a public health standard. 20 miles, everything was fine. And then when it came to these, what is the velocity of the winds when you have these three events? They varied. For the events in September 2006, the velocities were generally pretty low in the 20s. They did not provide a lot of information about these being unusually high because the evidence they relied on were assumptions that about the thunderstorm theory that was largely speculative and not supported by data. The events in 2007 had higher, slightly higher wind speeds associated with them. Thank you. Has any district judge been involved in any of these? This comes straight from the agency. You mean the documentation that they submitted to EPA? No federal judge has been involved in trying to make a deal here, right? No. Well, maybe you can agree to have us send the case down to a federal judge to mediate it. It's been done before. I think we will. You don't have to come in. All right. Thank you. Thank you. Just to answer your question about wind speeds, if you look at excerpts of records, pages 80 through 81 and 82, there's a discussion of the wind speed for each one, and the agency itself refers to those wind speeds as clear outliers that were statistically significantly above the historical norms. They were as high as the mid-30s in places, and then some were lower but associated with very unusual things. Part of the breakup of Hurricane John that year, you may recall? That was the thunderstorm activity that the district was dealing with. What does the county do to see to it that as far as the agriculture is concerned? I know they look at a menu, but what do you do to make sure that what they choose in the menu is actually being carried out in the ground? There are very significant parts of the regulation in the breakdown of the tradition. It's been around. It was put in place in 2005. It was done with the blessing of EPA at the time and the assurance that it would be approved was back then. Who do you have on the ground in Imperial County? We have district officials that enforce these things. How many do you have that go out to check on this? I don't know the precise number, Your Honor, but I can tell you that there is a substantial effort and that it's had tremendous success over the five years this plan has been in place at lowering the emissions that are reported at the months. The important thing is to get someone down there that checks on these. Absolutely. I'm asking you, how many people go out? I think five individuals that spend their time. I think both of them had five up. Does that mean ten? Okay. All right, you've answered my question. Thanks. We would, by the way, be fine with mediating. We think the exceptional events part of this is a legal error that needs to be reversed, but as far as the contents of BACM, we have no opposition to mediation to try to work it through and if the court wanted to recommend that or something, we'd be fine with it. It's good to know. Thank you. And we'll recess until tomorrow morning at 9 o'clock. Thank you. We had a good session today. This court is adjourned.
judges: Pregerson, Hawkins, Bea